UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

Rodney Smith, Leon Wilson, Brendan Vilella, Eric
Johnson, Marquailas Gray, Joseph Anderson, Sherwin
Alvarez, Dwayne Patterson, Anibel Perez Colon,
Jeffrey Coriolan, Devon Brown, Teddy Spann, Daquan
Brown, Tyshawn Kennedy, Michael Rock, Deshawn
Paige, Taheem Pratt, Zantwon Tucker, Natoine
Marshall, Isiah Foster, Steven Mitchell and Fernando
Bell

PLAINTIFFS

**COMPLAINT AND
JURY DEMAND**

15-CV-3859

- Against -

THE CITY OF NEW YORK, DEPARTMENT OF
CORRECTION COMMISSIONER JOSEPH PONTE,
WILLIAM CLEMONS, CORRECTION OFFICER
CAPTAIN FRASER, CAPTAIN "JOHN" DIAZ, CORRECTIONS OFFICER "JOHN"
WASHINGTON, CORRECTION OFFICER
"JOHN" STERLING, and JOHN AND JANE DOE ##1-15

DEFENDANTS

------------------------------------------------------------------X

Plaintiffs Rodney Smith, Leon Wilson, Brendan Vilella, Eric Johnson, Marquailas Gray,

Joseph Anderson, Sherwin Alvarez, Dwayne Patterson, Anibel Perez Colon, Jeffrey Coriolan,

Devon Brown, Teddy Span, Daquan Brown, Tyshawn Kennedy, Michael Rock, Deshawn Page,

Taheem Pratt, Zantwon Tucker, Natoine Marshall, and Fernando Bell by their attorneys, Raoul

Zaltzberg, Esq. and Robert Marinelli, Esq., complaining of the defendants, respectfully allege as

follows:

**PRELIMINARY STATEMENT**

1. Plaintiffs bring this action for compensatory damages, punitive damages and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988 for violations of their civil rights, as said rights are secured by said statutes and the Constitutions of the State of New York and the United States.

2. The claim arises from an incident occurring on February 16, 2015, in which officers, captains, and other employees of the New York City Department of Corrections ("DOC") acting under the color of state law subjected plaintiff to, among other things: excessive force, deliberate indifference to safety and/or medical needs and failure to protect.

**JURISDICTION & VENUE**

3. This action is brought pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1988, and the Fourth and Fourteenth Amendments to the United States Constitution.

4. Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 1367.

5. The amount in controversy exceeds $75,000.00 excluding interest and cost.

6. Venue is properly laid in the Eastern District of New York under 28 U.S.C. § 1391(b), in that this is the District in which the claim arose.

**JURY DEMAND**

7. Plaintiffs respectfully demand a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

**PARTIES**

8. Plaintiffs Rodney Smith, Leon Wilson, Brendan Vilella, Eric Johnson, Marquailas Gray, Joseph Anderson, Sherwin Alvarez, Dwayne Patterson, Anibel Perez Colon, Jeffrey Coriolan, Devon Brown, Teddy Span, Daquan Brown, Tyshawn Kennedy, Michael Rock,

Deshawn Page, Taheem Pratt, Zantwon Tucker, Natoine Marshall, Steven Mitchell, and Isaiah Foster ("plaintiffs") are citizens of the United States and at all times here relevant resided in the City and State of New York. They were detainees at the time of the incidents, in the custody of the DOC.

9. The City of New York is a municipal corporation organized under the law of the State of New York.

10. New York City Department of Correction Commissioner Joseph Ponte ("Ponte") was at all times relevant the Commissioner of the New York City Department of Correction, and, as such, was a policy maker with respect to training, supervision, and discipline of DOC officers, including the other individual defendants. On information and belief, defendant Ponte, as Commissioner of DOC, was responsible for the policy, practice, supervision, implementation, and conduct of all DOC matters and was responsible for the appointment, training supervision, and conduct of all DOC personnel, including the defendants referenced herein. As Commissioner, defendant Ponte is also responsible for the care, custody, and control of all inmates housed in the Department's jails. As Commissioner, Ponte is provided with reports of all security breaches by inmates in D.O.C. custody. Defendant Ponte is sued in his official capacity.

11. At all times relevant hereto, William Clemons ("Clemons") was the Chief of the Department of the New York City Department of Correction, acting in the capacity of agent, servant, and employee of defendant City, within the scope of his employment as such, acting under the color of state law. As Chief of Department, Clemons is the highest ranking uniformed member of the department, and is responsible for the supervision, oversight, and discipline of uniformed security staff, including the supervisory security staff, in all Department Jails. As

Chief of Department, Clemons is provided with reports of security breaches by inmates in D.O.C. custody, Defendant Clemons is sued in his official capacity.

12. At all times relevant hereto, Captains "John" Diaz ("Diaz") and "John" Fraser ("Fraser"), were corrections officer for the Department of the New York City Department of Correction, acting in the capacity of agent, servant, and employee of defendant City, within the scope of his employment as such, acting under the color of state law.

13. At all times relevant hereto, Correction Officers "John" Washington ("Washington") and "John" Sterling ("Sterling"), were corrections officer for the Department of the New York City Department of Correction, acting in the capacity of agent, servant, and employee of defendant City, within the scope of his employment as such, acting under the color of state law.

14. All other individual defendants are officers, captains, and assistant deputy warden employees of the DOC, and are sued in their individual capacities.

15.  At all times hereinafter mentioned the defendants were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

## **JOINT LIABILITY**

16. The action falls within one or more of the exceptions set forth in C.P.L.R. § 1602.

## FACTS

17. At the time of the events complained of, plaintiffs were all inmate at the Otis Bantum Correctional Center  ("OBCC"), a detention center at Rikers Island operated by DOC.

18. On or about February 12, 2015 the individual cells at OBCC's 5-west cell area were kept unlocked twenty-four hours a day.

19. Inmates housed in this area had free reign to enter and leave their cells at their whim.

20. On or about February 16, 2015 certain guards assigned to OBCC 5-west learned of this issue.

21. On February 16, 2015 at approximately 5:00 p.m., due to the guards' failure to properly secure the cells, defendants threatened plaintiffs with retaliation and herded plaintiffs into a "gym" area within OBCC.

22. Plaintiffs, as well as other inmates housed in OBCC 5-west, were then corralled into a gym area by numerous corrections officers, including Diaz, Fraser, Sterling and Washington.

23. Plaintiffs were then left in the gym for several hours without food, water or the ability to use the rest rooms.

24. The windows in the gym were closed and the air conditioners were left on causing numerous plaintiffs to complain about being cold and uncomfortable. Numerous plaintiffs coughed, sneezed and exhibited indications of illness.

25. At approximately 8:00 p.m. the defendants, including Diaz, Fraser, Sterling and Washington, along with Emergency Services Unit (ESU), wearing gas masks, came storming into the gym in full riot gear carrying canisters of MK-9 Pepper Spray ("MK-9") and closing the gym doors behind them.

26. The defendants, beginning with C. O. Sterling, then began indiscriminately spraying MK-9 at the plaintiffs.

27. Each Plaintiff was subjected to excessive force as enumerated below.

## **Excessive Force used against** Plaintiff Rodney Smith

28. Rodney Smith, while standing near the bleachers in the gym when ESU came in, was thrown to the ground by the defendants. One of the defendants then dropped down onto his neck with his knee and flex cuffed him. This caused Mr. Smith's mouth to smash into the gym floor.

29. As a result Mr. Smith sustained a 2-3 inch in diameter bump on his neck, a cut to his mouth and Mr. Smith urinated in his pants.

30. As Mr. Smith was bleeding from his mouth another defendant kicked him in the side of his face.

31. Mr. Smith was then pulled up violently by his cuffs and slammed face first into the gym wall causing a tooth to chip.

32. He was then taken to the intake are where he was strip searched, and placed in the intake cells. Hours later he was placed back into his cell. He was denied water and medical treatment throughout that time.

33. Mr. Smith suffered swelling, bruising, cuts, to his face and back and a chipped tooth. He also suffered pain, redness, swelling, and blurred vision from the MK-9 chemical spray being sprayed into his eyes and had difficulty and pain breathing.

34. On February 17, 2015 Mr. Smith was taken to the clinic where he overheard Captain Diaz instructing the medical staff and various officers on what to write and what not to write when documenting injuries.

35. On February 17, 2015 Mr. Smith was not properly examined by clinic doctors, given no medication for his pain or his previous condition, and no injuries were documented despite visible cuts, bruises, welts, and a chipped tooth.

36. On February 23, 2015 Mr. Smith had met with members of Prisoners Rights. He had still not received dental treatment or any medication. That was despite his daily requests for medical attention regarding the pain in his mouth, neck and shoulder.

### Excessive Force used against Plaintiff Leon Wilson

37. Leon Wilson, standing inside the gym with other plaintiffs when ESU came in, was engulfed in the MK-9 pepper spray and coughing when a defendant struck him.

38. Mr. Wilson fell to the ground and was immediately zip tied by the defendants.

39. Mr. Wilson was then dragged across the gym floor towards an exit. Before he was taken out of the gym at least two defendants began punching, kicking and stomping on him as he lay on the floor cuffed and coughing.

40. As a result he suffered bruising and swelling to his face, head, shoulder, arms and legs. He also suffered pain, redness, swelling, and blurred vision from the MK-9 chemical spray being sprayed into his eyes and had difficulty and pain breathing.

41. Mr. Wilson was then taken to the intake area, strip searched, and placed in the intake cells. Hours later he was placed back into his cell. He was denied water and medical treatment throughout that time.

42. Mr. Wilson was denied medical treatment for nearly a week, despite daily requests to see a doctor for the pain in his face, arms, legs, head, eyes and lungs.

### Excessive Force used against Brendan Vilella

43. Brendon Vilella was on the the outside of the gym door near the mailroom talking to Captain Diaz and other defendants when ESU came into the gym.

44. He was instructed by Captain Diaz to stand facing the gym wall. He was then flex cuffed by other defendants and brought inside the closed gym doors.

45. Mr. Vilella was instructed to stay facing the wall. As he came into contact with the MK-9 Chemical spray he began coughing. He was then punched in the right side of the face by a defendant for not facing the wall.

46. Mr. Vilella was then sprayed directly in the face, eyes, nose and mouth by a defendant with a canister of MK-9.

47. Mr. Vilella was then kicked in the side and back of his left leg several times and punched repeatedly after he fell to the ground.

48. He was then pulled up by his cuffs, slammed against the wall and told by at least one defendant: "To face the fucking wall or we will fuck you up."

49. Mr. Vilella was then escorted out of the gym and placed in the intake area.

50. Mr. Vilella was then strip searched, and placed in the intake cells. Hours later he was placed back into his cell. He was denied water and medical treatment throughout that time.

51. Mr. Vilella suffered swelling, bruising, cuts, a swollen leg, numbness in his right wrist and a ringing in his right ear. He also suffered pain, redness, and blurred vision from the MK-9 chemical spray being sprayed into his eyes and had difficulty and pain breathing.

52. Mr. Vilella was treated over twenty-four hours later. He was told he would be given a follow up for the ringing in his right ear.

53. Despite numerous requests, Mr. Villella was been denied access to treatment.

54. When Mr. Villella was finally given medical treatment, it was determined it was medically necessary to use a hearing aid to correct the damage sustained to his ears.

## **Excessive Force used against Eric Johnson**

55. Eric Johnson was near the bleachers when the defendants, including ESU came into the gym.

56. The defendants instructed him to get on the ground. Before he could do so he was sprayed directly in the eye, nose and mouth by a defendant holding a canister of MK-9 from a distance of less then 2-3 feet.

57. The impact of the chemical spray caused him to immediately fall to the floor.

58. While on the floor, Mr. Johnson was repeatedly kicked, punched and struck by multiple defendants.

59. He was then kneed in the back and zip tied.

60. Mr. Johnson was then picked up by at least one defendant and slammed into the gym wall backward causing pain to his back.

61. He was then taken to the intake area.

62. Mr. Johnson was then strip searched, and placed in the intake cells. Hours later he was placed back into his cell. He was denied water and medical treatment throughout that time.

63. Mr. Johnson suffered swelling, bruising, and pain to his head and back. He also suffered pain, redness, swelling, and blurred vision from the MK-9 chemical spray being sprayed into his eyes and had difficulty and pain breathing.

64. Mr. Johnson made numerous requests for medical attention after this incident and was repeatedly denied.

## **Excessive Force used against Marquailes Gray**

65. Marquailes Gray was in the gym when the defendants, including ESU came into the gym.

66. The defendants instructed him to get on the ground. Before he could do so he was sprayed directly in the eye, nose and mouth by a defendant holding a canister of MK-9 from a distance of less then 2-3 feet.

67. The impact of the chemical spray caused him to immediately fall to the floor.

68. While on the floor, Mr. Gray was repeatedly kicked, punched and struck by multiple defendants.

69. Mr. Gray was then kneed in the back and zip tied. He was then taken to the intake area.

70. Mr. Gray was then strip searched, and placed in the intake cells. Hours later he was placed back into his cell. He was denied water and medical treatment throughout that time.

71. Mr. Gray suffered swelling, bruising, and pain to his face, back and head. He also suffered pain, redness, swelling, and blurred vision from the MK-9 chemical spray being sprayed into his eyes and had difficulty and pain breathing.

## **Excessive Force used against Joseph Anderson**

72. Joseph Anderson was near the rear of the gym when the defendants, including ESU came into the gym.

73. The defendants instructed him to get on the ground. Before he could do so he was sprayed directly in the eye, nose and mouth by a defendant holding a canister of MK-9 from a distance of less then 2-3 feet. He asked them to stop and repeatedly screamed " I have asthma. I can't breath."

74. The impact of the chemical spray caused him to immediately fall down onto the floor.

75. Mr. Anderson was then repeatedly kicked, punched and stepped on by defendants. He was kicked in the face, kidneys and groin causing him to defecate on himself.

76. Mr. Anderson, due to his size and past medical condition has a front cuff only order.

77. Despite the order, he was zip tied from the rear. This caused his wrists to swell and his skin to tear in areas.

78. Mr. Anderson was then taken to the intake area.

79. Mr. Anderson was then strip searched, and placed in the intake cells. Hours later he was placed back into his cell. He was denied water and medical treatment throughout that time.

80. Mr. Anderson suffered swelling, bruising, and pain to his face, body, ribs, kidneys, wrists and lower back. Mr. Anderson also was urinating blood after this incident.

81. Mr. Anderson suffered pain, redness, swelling, and blurred vision from the MK-9 chemical spray being sprayed into his eyes and had difficulty and pain breathing.

82. Despite his complaints of shortness of breath due to the chemical spray combined with his asthma, he was not taken to see a doctor until the following day.

83. He has continued to have issues with his breathing since the incident due to his previous asthmatic condition.

84. He has been denied his proper medication, including his seizure medication, since this incident.

## **Excessive Force used against Zantwon Tucker**

85. Zantwon Tucker was right outside the gym when ESU came in.

86. Mr. Tucker was then sprayed directly in the face, eyes, nose and mouth by a defendant with a canister of MK-9.

87. Mr. Tucker was thrown against a wall and struck by the defendants.

88. As a result of this use of force, a gash was opened on Mr. Tucker's head.

89. Mr. Tucker was then zip tied. As he was on the ground he was sprayed repeatedly in the eyes, nose and mouth with MK-9 chemical spray by the defendants.

90. Mr. Tucker was then taken to the intake-area, strip searched, and placed in the intake cells. Hours later he was placed back into his cell. He was denied water and medical treatment throughout that time.

91. Later that evening, Mr. Tucker was taken for medical treatment where twelve stitches were required to close his wound.

### Excessive Force used against Natoine Marshall

92. Natoine Marshall was near the middle of the gym when ESU came in.

93. Three to four defendants threw Mr. Marshall to the ground. As they attempted to zip tie him, his arm was twisted to the point that his shoulder popped out of its socket. He was screaming for them to stop.

94. Mr. Marshall was then picked up by his zip tied hands and dragged over to the gym wall. The defendants then slammed him head first into the wall causing a cut over his left eye.

95. Mr. Marshall was then taken to the intake area. He was then strip searched, and placed in the intake cells. Hours later he was placed back into his cell. He was denied water and medical treatment throughout that time.

96. Mr. Marshall suffered an injury to his shoulder, swelling, bruising, a cut to his left eye. He also suffered pain, redness, swelling, and blurred vision from the MK-9 chemical spray being sprayed into his eyes and had difficulty and pain breathing.

### Excessive Force used against Taheem Pratt

97. Taheem Pratt was in the gym when ESU came in.

98. Mr. Pratt was dragged to the ground by the defendants.

99. While on the ground he was punched, kicked and struck on the back, head and arms.

100.   Mr. Pratt was then zip tied. As he was on the ground he was sprayed repeatedly in the
eyes, nose and mouth with MK-9 chemical spray by the defendants.

101.   Mr. Pratt was then taken to the intake area, strip searched, and placed in the intake cells.
Hours later he was placed back into his cell. He was denied water and medical treatment
throughout that time.

102.   Mr. Pratt suffered swelling, bruising, and pain to his face, back and wrist. He also
suffered pain, redness, swelling, and blurred vision from the MK-9 chemical spray being
sprayed into his eyes and had difficulty and pain breathing.

### Excessive Force used against Isaiah Foster

103.   Isaiah Foster was in the gym when ESU came in.

104.   Mr. Foster was dragged to the ground by the defendants. As he was on the ground he was
sprayed repeatedly in the eyes, nose and mouth with MK-9 chemical spray by the defendants.

105.   While on the ground he was punched, kicked and struck on the back, head and arms.

106.   Mr. Foster was then zip tied. He was then taken to the intake area.

107.   Mr. Foster was then strip searched, and placed in the intake cells. Hours later he was
placed back into his cell. He was denied water and medical treatment throughout that time.

108.   Mr. Foster suffered swelling, bruising, and pain to his face, back and wrist. He also
suffered pain, redness, swelling, and blurred vision from the MK-9 chemical spray being
sprayed into his eyes and had difficulty and pain breathing.

### Excessive Force used against Jeffrey Coriolan

109.   Jeffrey Coriolan was sitting on the bleachers when the defendants, including the ESU
team came into the gym.

110.   The defendants grabbed Mr. Coriolan from the bleachers and attempted to pull him to the
floor.

111.    As he was being pulled, his right foot and ankle got caught in the bleachers. As a result he suffered pain, swelling and bruising to his right ankle.

112.    The defendants eventually got Mr. Coriolan to the ground and proceeded to punch, kick and strike him about the hands, arms, legs, face and body. In addition at least one defendant stomped on his hand and another defendant stomped on his injured ankle.

113.    Mr. Coriolan was then zip tied.

114.    Mr Coriolan was then taken to the intake area. He was then strip searched, and placed in the intake cells. Hours later he was placed back into his cell. He was denied water and medical treatment throughout that time.

115.    Mr. Coriolan suffered swelling, bruising, and pain to his face, wrist, hand, legs and right ankle. He also suffered pain, redness, swelling, twitching in his and blurred vision from the MK-9 chemical spray being sprayed into his eyes and had difficulty and pain breathing.

116.    Despite repeated requests for medical attention Mr. Coriolan never received any.

**Excessive Force used against Anibel Perez Colon**

117.    Anibel Perez Colon was near the bleachers when the defendants and ESU came into the gym.

118.    The defendants instructed him to get on the ground. Before he could do so he was sprayed directly in the eye, nose and mouth by a defendant holding a canister of MK-9 from a distance of less then 2-3 feet.

119.    The impact of the chemical spray caused him to immediately fall to the floor.

120.    While on the floor, Mr. Perez Colon was repeatedly kicked, punched and struck by multiple defendants.

121.    He was then kneed in the back and zip tied.

122.    Mr. Perez Colon was then picked up by at least one defendant and pushed face first into the gym wall causing his front tooth to chip.

123.    He was then taken to the intake area.

124.    Mr. Perez Colon was then strip searched, and placed in the intake cells. Hours later he was placed back into his cell. He was denied water and medical treatment throughout that time.

125.    Mr. Perez Colon suffered swelling, bruising, and pain to his face, back and a chipped front tooth. He also suffered pain, redness, swelling, and blurred vision from the MK-9 chemical spray being sprayed into his eyes and had difficulty and pain breathing.

126.    Mr. Perez Colon was denied medical and dental attention until Friday, February 20, 2015.

## **Excessive Force used against Steven Mitchell**

127.    Steven Mitchell was inside of the gym when the defendants, including ESU came into the gym.

128.    Mr. Mitchell was dragged to the ground and repeatedly punched, kicked and struck by the defendants.

129.    He was also sprayed directly in the face by chemical spray.

130.    Mr. Mitchell was then zip tied and taken to the intake area.

131.    Mr. Mitchell was then strip searched, and placed in the intake cells. Hours later he was placed back into his cell. He was denied water and medical treatment throughout that time.

132.    Mr. Mitchell suffered swelling, bruising, and pain to his mouth, head, and ribs. He also suffered pain, redness, swelling, and blurred vision from the MK-9 chemical spray being sprayed into his eyes and had difficulty and pain breathing.

133.    Mr. Mitchell made numerous requests for medical attention after this incident and was repeatedly denied.

## **Excessive Force used against Teddy Spann**

134.    Teddy Spann was in the gym when the defendants, including ESU, entered the gym.

135.    Mr. Spann was thrown to the ground and sprayed directly in the eye, nose and mouth by a defendant holding a canister of MK-9 from a distance of less then 2 feet.

136.    While on the floor, Mr. Spann was repeatedly kicked, punched and struck in the back and legs by multiple defendants.

137.    He was then kneed in the back and zip tied. As he was zip tied the defendants injured Mr. Spann's wrist.

138.    Mr. Spann has a history of back problems and was previously shot in the thigh.

139.    Mr. Spann was then lifted up by the defendants and slammed head first into the gym wall.

140.    He was then taken towards the intake area. As he was descending the stairs, he was pushed by the defendants and fell down the stairs.

141.    Mr. Spann was then strip searched, and placed in the intake cells. Hours later he was placed back into his cell. He was denied water and medical treatment throughout that time.

142.    Mr. Spann suffered injuries to his back, leg, head and wrist. He also suffered pain, redness, swelling, and blurred vision from the MK-9 chemical spray being sprayed into his eyes and had difficulty and pain breathing.

143.    Mr. Spann was taken for medical attention the following day.

144.    The doctors told him that because he had no visible swelling he could not be treated. He was then sent back. His subsequent medical requests were denied.

## **Excessive Force used against Michael Rock**

145.    Michael Rock was near the bleachers when the defendants, including ESU came into the gym.

146.    The defendants instructed him to get on the ground. Before he could do so he was sprayed directly in the eye, nose and mouth by a defendant holding a canister of MK-9 from a distance of less then 2-3 feet.

147.    The impact of the chemical spray caused him to immediately fall to the floor.

148.    While on the floor, Mr. Rock was repeatedly kicked, punched and struck by multiple defendants.

149.    He was then kneed in the back and zip tied.

150.    Mr. Rock was then picked up by at least one defendant and pushed face first into the bleachers causing his front tooth to chip and his lip to swell.

151.    He was then taken to the intake area.

152.    Mr. Rock was then strip searched, and placed in the intake cells. Hours later he was placed back into his cell. He was denied water and medical treatment throughout that time.

153.    Mr. Rock suffered swelling, bruising, and pain to his face, back, lip and a chipped front tooth. He also suffered pain, redness, swelling, and blurred vision from the MK-9 chemical spray being sprayed into his eyes and had difficulty and pain breathing.

154.    Mr. Rock made numerous requests for medical attention after this incident and was repeatedly denied.

## **Excessive Force used against Fernando Bell**

155.    Fernando Bell was sitting on the bleachers when the defendants, including ESU came into the gym.

156.    The defendants instructed him to get on the ground. Before he could do so he was sprayed directly in the eye, nose and mouth by a defendant holding a canister of MK-9 from a distance of less then 2-3 feet.

157.    The impact of the chemical spray caused him to immediately fall onto the bleachers.

158.    While on the bleachers, Mr. Bell was dragged to the gym floor by multiple defendants. He was then repeatedly kicked, punched and struck by those defendants.

159.    He was then zip tied and was then picked up by at least one defendant and thrown head first into the gym wall causing a visible and painful lump to his forhead.

160.    He was then taken to the intake area.

161.    Mr. Bell was then strip searched, and placed in the intake cells. Hours later he was placed back into his cell. He was denied water and medical treatment throughout that time.

162.    Mr. Bell suffered swelling, bruising, and pain to his head and body. He also suffered pain, redness, swelling, and blurred vision from the MK-9 chemical spray being sprayed into his eyes and had difficulty and pain breathing.

163.    Mr. Bell was denied medical treatment, despite his requests, for three days.

## **Excessive Force used against Deshawn Paige**

164.    Deshawn Paige was near the rear of the gym when the defendants, including ESU came into the gym.

165.    The defendants instructed him to get on the ground. Before he could do so he was sprayed directly in the eye, nose and mouth by a defendant holding a canister of MK-9 from a short distance.

166.    The impact of the chemical spray caused him to immediately fall to the ground. He was then repeatedly kicked, punched and struck by the defendants.

167.    Mr. Paige was kicked so hard by at least one defendant that he briefly lost consciousness and urinated himself.

168.    He was zip tied and was then picked up by at least one defendant and slammed into the gym wall.

169.    He was then taken to the intake area.

170.    Mr. Paige was then strip searched, and placed in the intake cells. Hours later he was

placed back into his cell. He was denied water and medical treatment throughout that time.

171.    Mr. Paige suffered swelling, bruising, and pain to his head and shoulder. He also suffered

pain, redness, swelling, and blurred vision from the MK-9 chemical spray being sprayed into

his eyes and had difficulty and pain breathing.

172.    Mr. Paige was denied medical treatment despite numerous requests to see a doctor for the

pain in his shoulder and head.

### **Excessive Force used against Devon Brown**

173.    Devon Brown was near the rear of the gym when the defendants, including ESU came

into the gym.

174.    The defendants instructed him to get on the ground. Before he could do so he was

sprayed directly in the eye, nose and mouth by a defendant holding a canister of MK-9 from

a distance of less then 2-3 feet. He asked them to stop and repeatedly screamed " I have

asthma. I can't breath."

175.    The impact of the chemical spray caused him to immediately fall down onto the floor.

176.    Mr. Brown was then repeatedly kicked, punched and stepped on by defendants.

177.    He was then kneed in the back and  zip tied. Mr. Brown was then taken to the intake area.

178.    Mr. Brown was then strip searched, and placed in the intake cells. Hours later he was

placed back into his cell. He was denied water and medical treatment throughout that time.

179.    Mr. Brown suffered swelling, bruising, and pain to his lower back. He also suffered pain,

redness, swelling, and blurred vision from the MK-9 chemical spray being sprayed into his

eyes and had difficulty and pain breathing.

180.    Despite his complaints of shortness of breath due to the chemical spray combined with

his asthma, he was not taken to see a doctor until the following day.

181.   He has continued to have issues with his breathing since the incident due to his previous

asthmatic condition.

## Excessive Force used against Dwayne Patterson

182.   Dwayne Patterson was in the middle of the gym when the defendants, including ESU

came into the gym.

183.   The defendants instructed him to get on the ground. Before he could do so a defendant

punched him in the mouth. This caused Mr. Patterson to fall to the ground. He also began

bleeding and lost a tooth.

184.    As he was on the ground he was punched and kicked by the defendants. At some point

he tried to crawl away from the beating and his pants came loose. A defendant holding a

canister of MK-9 then sprayed him directly in his buttocks and testicles.

185.   He was then zip tied and taken to the intake area.

186.   Mr. Patterson was then strip searched, and placed in the intake cells. Hours later he was

placed back into his cell. He was denied water and medical treatment throughout that time.

187.   Mr. Patterson suffered swelling, and pain to his head. He also had a split lip and lost a

tooth. Finally he suffered severe pain to his testicles from the direct contact with the MK-9

chemical spray. He also suffered pain, redness, swelling, and blurred vision from the MK-9

chemical spray being sprayed into his eyes and had difficulty and pain breathing.

188.   A doctor did not see Mr. Patterson, despite numerous requests for medical attention and

to help find his tooth for two days.

## Excessive Force used against Daquan Brown

189.   Daquan Brown was in the gym when the defendants, including ESU came into the gym.

190.    The defendants instructed him to get on the ground. Before he could do so he was sprayed directly in the eye, nose and mouth by a defendant holding a canister of MK-9 from a distance of less then 2-3 feet.

191.    The impact of the chemical spray caused him to immediately fall onto gym floor.

192.    Mr. Brown was then repeatedly kicked, punched and struck by defendants.

193.    He was then zip tied and was then picked up by at least one defendant and thrown head first into the gym wall causing his front teeth to crack.

194.    He was then taken to the intake area.

195.    Mr. Brown was then strip searched, and placed in the intake cells. Hours later he was placed back into his cell. He was denied water and medical treatment throughout that time.

196.    Mr. Brown suffered swelling, bruising, and pain to his head and body. He also chipped is front teeth.  He also suffered pain, redness, swelling, and blurred vision from the MK-9 chemical spray being sprayed into his eyes and had difficulty and pain breathing.

197.    Mr. Brown was repeatedly denied medical attention.

## **Excessive Force used against Tyshawn Kennedy**

198.    Tyshawn Kennedy was sitting on the bleachers when the defendants, including ESU came into the gym.

199.    The defendants instructed him to get on the ground. They then grabbed him by the arms and body and threw his down the bleachers causing his face to hit the metal bleachers and knocking out a tooth.

200.    Mr. Kennedy was then dragged onto the gym floor and repeatedly punched, kicked and struck by the defendants. He was then zip tied.

201.    While zip tied he was sprayed directly in the eye, nose and mouth by a defendant holding a canister of MK-9 from a distance of less then 2 feet.

202.    Mr. Kennedy was then taken to the intake area where he was strip searched, and placed in

the intake cells. Hours later he was placed back into his cell. He was denied water and

medical treatment throughout that time.

203.    Mr. Kennedy suffered swelling, bruising, and pain to his head lost a tooth. He also

suffered pain, redness, swelling, and blurred vision from the MK-9 chemical spray being

sprayed into his eyes and had difficulty and pain breathing.

204.    Mr. Kennedy was repeatedly denied medical or dental attention.

## **Excessive Force used against Sherwin Alvarez**

205.    Sherwin Alvarez was sitting on the bleachers when the defendants, including ESU came

into the gym.

206.    The defendants instructed him to get on the ground. He lied down on the bleachers.

207.    Mr. Alvarez he was sprayed directly in the eye, nose and mouth by a defendant holding a

canister of MK-9 from a distance of less 3-4 feet.

208.    Mr. Alvarez was then picked up by his waist band and dropped down face first onto the

next set of bleachers where he was then zip tied.

209.    Mr. Alvarez was then lifted up and placed against the gym wall where he was instructed

to face the wall.

210.    Mr. Alvarez attempted to wipe his tearing eyes against his shoulder when his head was

slammed into the wall by a defendant who shouted :"I told you to face the fucking wall."

211.    Mr. Alvarez immediately felt pain and dizziness as a result of the impact.

212.    Mr. Alvarez was then taken to the intake area where he was strip searched, and placed in

the intake cells. Hours later he was placed back into his cell. He was denied water and

medical treatment throughout that time.

213.    Mr. Alvarez suffered swelling, bruising, and pain to head. He also suffered pain, redness, swelling, and blurred vision from the MK-9 chemical spray being sprayed into his eyes and had difficulty and pain breathing.

214.    Mr. Alvarez was repeatedly denied medical or dental attention.

215.    The defendants then began dragging and slamming the plaintiffs into walls and into the floor as they were carried out of the gym individually.

## Immediately After the Incident

216.    The defendants brought the plaintiffs into the intake area at OBCC, strip searched them, and placed into crowded intake cells. The plaintiffs were cuffed and left in the cells for over two hours. Then they were brought back to their cells.

217.    All plaintiffs were denied medical treatment despite every one of them asking for treatment.

218.    All plaintiffs were covered in chemical pepper spray.

219.    All plaintiffs were denied water. Numerous plaintiffs resorted to using toilet water in attempt to get the chemical pepper spray out of their eyes.

## Post Incident Retaliation

220.    Since on or about February 25, 2015 defendants have become aware that plaintiffs intended to seek redress for the above wrongs.

221.    Since that time, plaintiffs have been denied access to their mail.

222.    Since that time, plaintiffs many have been have been sent into solitary confinement and been resigned to hand constraint without valid cause.

223.    On March 4, 2015, the day of the hearing by corrections to review this incident, the entire house was placed on lockdown. Plaintiffs were not allowed to testify at this hearing, despite their desire to do so.

224.    As a direct and proximate result of the acts of the defendant. Plaintiff suffered the

following injuries and damages:

    a.   Violation of his rights to Due Process of Law under the Fourteenth Amendment of to

       the United States Constitution;

    b.   Violation of his rights to be free of unreasonable seizures under the Fourth

       Amendment to the United States Constitution;

    c.   Physical pain and suffering

    d.   Emotional distress, mental anguish, fear, anxiety, embarrassment, humiliation, and

       damage to their reputation.

## FIRST CLAIM FOR RELIEF

### DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. § 1983

225.    Plaintiffs repeat and reallege each and every allegation set forth herein.

226.    All of the aforementioned acts of defendants, their agents, servants, and employees, were carried out under the color of state law.

227.    All of the aforementioned acts deprived plaintiffs of the rights privileges, and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States of America, and are in violation of 42 U.S.C. § 1983.

228.    The aforementioned individual defendants in their capacities as corrections officers carried out the acts complained of, with all of the actual and/or apparent authority attendant thereto.

229.    The acts complained of were carried out by the aforementioned individual defendants in their capacities as corrections officers, pursuant to the customs, usages, practices, procedures, and the rules of the City of New York and the DOC, all under the supervision of ranking officers of said department.

230.    Defendants, Collectively and individually, while acting under the color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

## SECOND CLAIM FOR RELIEF

### EXCESSIVE FORCE UNDER 42 U.S.C. § 1983

231.    Plaintiffs repeat and reallege each and every allegation set forth herein.

232.    The level of force employed by defendants was objectively unreasonable and in violation of plaintiffs constitutional rights.

233.    As a result of defendant's unlawful actions, plaintiffs suffered physical injuries, as well as severe emotional distress, humiliation, and deprivation of their constitutional rights.

### THIRD CLAIM FOR RELIEF
### DELIBERATE INDIFFERENCE TO SAFETY/MEDICAL NEEDS

234.    Plaintiffs repeat and reallege each and every allegation set forth herein.

235.    The individual defendants were ware of a risk to the plaintiffs safety and a need for medical care and failed to act in deliberate indifference to both the plaintiffs needs.

236.    Accordingly, defendants violated the fourteenth amendment because they acted with deliberate indifference to plaintiffs medical needs and safety.

237.    As a direct and proximate result of this unlawful conduct, plaintiffs sustained the damages alleged herein.

### FOURTH CLAIM
### FAILURE TO INTERVENE

238.    Plaintiffs repeat and reallege each and every allegation as if fully set forth herein.

239.    Those defendants that were present but did not actively participate in the aforementioned unlawful conduct observed such conduct, had an opportunity prevent such conduct, had a duty to intervene and prevent such conduct and failed to intervene.

240.    As a direct and proximate result of this unlawful conduct, Plaintiffs sustained the damages hereinbefore alleged.

## FIFTH CLAIM FOR RELIEF

## MONELL CLAIM UNDER 42 U.S.C. §1983

241.   For decades, through Department reports and civil litigation, DOC has been aware of the routine, dangerous, and unconstitutional use of excessive force by staff at individual facilities in the large, multi-jail New York City Department of Correction.[1]

242.   For example, *Sheppard v. Phoenix*, 210 F. Supp. 2d 250 (S.D.N.Y. 1998) (terminating injunction), was a class action that concerned the City's Central Punitive Segregation Unit (CPSU). That litigation unearthed abuse of prisoners and cover-ups sufficiently serious to merit criminal prosecution.

243.   *Ingles v. Toro*, 438 F. Supp. 2d 203 (S.D.N.Y. 2006) (approving stipulation of settlement), was a system-wide class action challenging the pervasive practice of using excessive force against inmates incarcerated in New York City's jails. This litigation revealed significant numbers of credible excessive force complaints from prisoners who had been seriously injured by staff in the City jails. The settlement of this class action was intended to provide meaningful improvements in the training, practice, and supervision of agency staff and investigators, and changes in the Department's use of force policy.

244.   In fact, since 2002, senior supervisors and uniformed staff in the DOC have been sued repeatedly by inmates alleging staff beatings. Many of these cases, all resulting in favorable judgments for plaintiffs following settlement, include remarkably similar allegations of misconduct. See, e.g.,

---

[1] *See, e.g., Fisher v. Koehler*, 692 F. Supp. 1519 (S.D.N.Y. 1988), *injunction entered*, 718 F. Supp. 1111 (1989), *aff'd*, 902 F.2d 2 (2d Cir. 1990) [Correction Institution for Men]; *Jackson v. Montemagno*, CV 85-2384 (AS) (E.D.N.Y.) [Brooklyn House of Detention]; *Reynolds v. Ward*, 81 Civ. 101 (PNL) (S.D.N.Y.) [Bellevue Prison Psychiatric Ward]; *Sheppard v. Phoenix*, 91 Civ. 4148 (RPP) (S.D.N.Y.) [Central Punitive Segregation Unit].

a. <u>Reynolds v. City of New York</u>, No. 11 Civ. 621 (S.D.N.Y.) (alleging beat-up in George Motchan Detention Center ("GMDC") resulting in shoulder fracture and loss of consciousness; settled for $200,500);

b. <u>Mull v. City of New York</u>, No. 08 Civ. 8854 (S.D.N.Y.) (alleging beat-up in AMKC resulting in diffuse axonal injury to brain, partial loss of eyesight, and partial loss of hearing, and requiring the victim to take seizure medications; settled for $550,000);

c. <u>Belvett v. City of New York</u>, No. 09 Civ. 8090 (S.D.N.Y.) (alleging beat-ups at GMDC and Robert N. Davoren Center ("RNDC") resulting in facial fracture;  settled for $350,000);

d. <u>Youngblood v. Baldwin</u>, No. 08 Civ. 5982 (S.D.N.Y.) (alleging beat-up at GRVC resulting in skull laceration and broken nose; settled for $240,000);

e. <u>Williams v. City of New York</u>, No. 07 Civ. 11055 (S.D.N.Y.) (alleging beat-up in Otis Bantum Correctional Center ("OBCC") resulting in fractured jaw and facial bones and torn earlobe; settled for $202,500);

f. <u>Williams v. City of New York</u>, No. 09 Civ. 5734 (S.D.N.Y.) (alleging beat-up in RNDC resulting in laceration to head; settled for $87,500);

g. <u>Lee v. Perez</u>, No. 09 Civ. 3134 (S.D.N.Y.) (alleging beat-up at North Infirmary Command ("NIC") resulting in multiple rib fractures, a spinal fracture and a collapsed lung; settled for $300,000);

h. <u>Shuford v. City of New York</u>, No. 09 Civ. 945 (S.D.N.Y.) (alleging two beat-ups at RNDC resulting in facial fractures; settled for $375,000);

i. Diaz v. City of New York, No. 08 Civ. 4391 (S.D.N.Y.) (alleging beat-ups involving two inmates, one at AMKC and one at OBCC; settled for $400,000 and $450,000, respectively);

j. Lugo v. City of New York, No. 08 Civ. 2931 (S.D.N.Y.) (alleging beat-up at NIC resulting in orbital fracture; settled for $185,000);

k. Cuadrado v. City of New York, No. 07 Civ. 1447 (S.D.N.Y.) (alleging beat-up at RNDC resulting in punctured lung; settled for $175,000);

l. Scott v. City of New York, No. 07 Civ. 3691 (S.D.N.Y.) (alleging beat-up at GMDC resulting in orbital fracture; settled for $175,000);

m. Pischeottola v. City of New York, No. 06 Civ. 2505 (S.D.N.Y.) (alleging beat-up at RNDC resulting in punctured lung requiring chest tube; settled for $150,000);

n. Rice v. N.Y.C. D.O.C., No. 03 Civ. 582 (S.D.N.Y.) (alleging beat-ups of two inmates at GRVC resulting in collapsed lung and contusion hematomas in one case, and in neck and spinal cord injuries causing permanent stutter in the other; settled for $255,000 and $590,000, respectively);

o. Joseph v. N.Y.C. D.O.C., No. 02 Civ. 9219 (S.D.N.Y.) (alleging beat-up at GRVC resulting in orbital fracture; settled for $375,000).

245. Additionally, through DOC's elaborate reporting system, defendants were aware of the pattern of a large number of incidents involving the use of unnecessary and/or excessive force by DOC staff members resulting in serious injuries to inmates but failed to take sufficient steps to curb these abuses.

246. As of the time plaintiffs were beaten, the Defendants were aware of the unwillingness of the Department to investigate adequately and impose meaningful discipline against DOC

staff members who use unnecessary and excessive force on prisoners, or who fail to accurately and honestly report it.

247.    Through all these cases and Department reports, DOC and its supervisors have been made aware of the widespread practice by DOC staff members of using excessive and/or unnecessary force to injure, and not restrain, inmates. They have also been made aware of the failures of DOC's Investigation Division to adequately investigate allegations of misconduct and of the *de facto* refusal of the Department to bring effective disciplinary charges against its officers to promote institutional reform and protect the safety of prisoners confined in DOC custody.

248.    The Department and the Defendants cannot credibly contend that they are unaware of the pattern of abuse that occurs with regularity in New York City jails and the failure of the Department to take sufficient measures to investigate and discipline this abuse.

249.    The Department has not taken sufficient steps to curb the abuse that occurs on a daily basis in New York City jails. Indeed, it allows that abuse to persist through inadequate investigations of allegations of misconduct and the failure to discipline officers in the face of obvious wrongdoing.

**WHEREFORE**, plaintiffs respectfully request judgment against defendants as follows:

   I.    Compensatory damages against all defendants, jointly and severally;

  II.    Punitive damages against the individual defendants, jointly and severally;

 III.    Reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 1988;  and

 IV.    Such other and further relief as this Court deems just and proper.

DATED:      June 27, 2015
            New York, New York


                                        /s
                                        Raoul Zaltzberg, Esq.
                                        Zaltzberg & Hutchinson, LLC
                                        305 Broadway
                                        Suite 900
                                        New York, NY 10007
                                        (212) 323-7418




                                        /s
                                        Robert Marinelli, Esq.
                                        305 Broadway
                                        Suite 900
                                        New York, NY 10007
                                        (212) 822-1427


                                        *Attorneys for Plaintiff*