UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------X
RODNEY SMITH, et al.,

                      Plaintiffs,

-against-

THE CITY OF NEW YORK, et al.,

                      Defendants.
-------------------------------------------------X

**MEMORANDUM
AND ORDER**

15 CV 3859 (PKC) (CLP)

**POLLAK**, United States Magistrate Judge:

On July 1, 2015, plaintiffs Rodney Smith, Leon Wilson, Brendan Vilella, Eric Johnson, Marquailes Gray, Joseph Anderson, Sherwin Alvarez, Dwayne Patterson, Anibel Perez-Colon, Jeffrey Coriolan, Devon Brown, Teddy Spann, Daquan Brown, Tyshawn Kennedy, Michael Rock, DeShawn Paige, Taheem Pratt, Zantwon Tucker, Natoine Marshall, Isaiah Foster, Steven Mitchell, and Fernando Bell (collectively, "plaintiffs") commenced this action against the City of New York (the "City"), Commissioner Joseph Ponte, Commissioner William Clemons, Captain "John" Fraser, Correction Officer "John" Diaz, Correction Officer "John" Washington, Correction Officer "John" Sterling, and fifteen John and Jane Doe defendants (collectively, "defendants"), pursuant to 42 U.S.C. § 1983. Plaintiffs allege violations of their civil rights stemming from an incident which took place at the Otis Bantum Correctional Center (the "OBCC") at Rikers Island on February 16, 2015 in which correctional officers allegedly locked plaintiffs in a gym without food and water, and then proceeded to use MK-9 Pepper Spray on plaintiffs (the "Incident").

Presently before the Court is defendants' motion for a protective order limiting disclosure of video evidence of the Incident until the completion of an internal investigation currently being conducted by the City. For the reasons set forth below, defendants' motion for a protective order is

denied.

## FACTUAL BACKGROUND

At the time of the Incident, plaintiffs were all inmates at OBCC on Rikers Island, housed in OBCC's 5-west cell area. (Compl.[1] ¶ 17). Plaintiffs allege that on or about February 12, 2015, certain guards failed to properly secure the cells, and thus, the individual cells at the facility's 5-west area were left unlocked, allowing the inmates to move freely in and out of their individual cells "at their whim." (Id. ¶¶ 18-19). On February 16, 2015, at approximately 5:00 p.m., plaintiffs allege that defendants Diaz, Fraser, Sterling and Washington learned of the problem and began making threats of retaliation toward the plaintiffs in response to the cells being left unlocked. (Id. ¶ 21). The guards allegedly herded the plaintiffs into a "gym" area, where plaintiffs were left for several hours without food, water, or the ability to use the restroom. (Id. ¶¶ 21-23). In addition, the windows in the gym were closed and the air conditioners were left on, causing numerous plaintiffs to feel cold and uncomfortable. (Id. ¶ 24). Several plaintiffs began coughing and sneezing. (Id.)

Plaintiffs further allege that at 8:00 p.m. on February 16, 2015, Diaz, Fraser, Sterling, Washington, and the Emergency Services Unit entered the gym dressed in riot gear and began indiscriminately spraying MK-9 pepper spray at the plaintiffs. (Id. ¶¶ 25-27). During this time, plaintiffs allege that they were all subjected to excessive force, resulting in various forms of physical injury. (Id. ¶¶ 28-215). Plaintiffs also allege that they were denied certain necessities including medical treatment, food, and water during and after the Incident. (Id.) After the

---

[1]Citations to "Compl." refer to the Complaint filed by plaintiffs on July 1, 2015.

2

Incident, plaintiffs allege they were handcuffed, brought to the intake area of the OBCC, strip searched, and placed into crowded cells for over two hours. (Id. ¶ 216). Plaintiffs also allege that they were denied necessary treatment, including water to wash the pepper spray from their eyes, despite numerous requests. (Id. ¶¶ 217-19).

Thereafter, plaintiffs allege that they have been denied access to their mail and subjected to solitary confinement and hand constraints without valid cause. (Id. ¶¶ 221-22). Plaintiffs also allege that on May 4, 2015 — the day on which a hearing about the Incident was to take place — the entire house was placed on lockdown, preventing plaintiffs from testifying. (Id. ¶ 223).

PROCEDURAL BACKGROUND

On July 1, 2015 plaintiffs filed a Complaint, pursuant to 42 U.S.C. § 1983, alleging various violations of their civil rights. Defendants filed an Answer on November 2, 2015. At a conference held before the undersigned on November 17, 2015, the parties notified the Court of a discovery dispute as to a copy of video footage of the Incident. The Court Ordered defendants to disclose the video footage to plaintiffs by November 20, 2015, or file a letter requesting a protective order. By letter dated November 20, 2015, defendants requested a protective order limiting the dissemination of the video footage pending the conclusion of an OBCC internal investigation into the Incident. Defendants also requested that the video footage be marked as "attorneys' eyes only," which would effectively limit the viewing of the footage to plaintiffs' attorneys, their staffs, and the Court. (Defs.' Ltr.[2] at 1). Plaintiffs opposed this request on November 24, 2015, explaining that the plaintiffs would need to be able to see the video before counsel could evaluate the validity of each

---

[2]Citations to "Defs.' Ltr." refer to the Letter Motion for a Protective Order, filed by defendants on November 20, 2015.

3

plaintiff's claims. (Pls.' Ltr.[3] at 1). Noting that the dispute potentially implicated the law enforcement privilege, the Court Ordered parties to brief the legal basis for their positions. Defendants filed briefing in support of the proposed protective order on December 9, 2015. Plaintiffs filed a brief in opposition on December 30, 2015.

## DISCUSSION

I. <u>Law Enforcement Privilege</u>

   A. <u>Standards</u>

In the Second Circuit, "[t]he law enforcement privilege is related to, and indeed an outgrowth of, the executive privilege long recognized at common law. The law enforcement privilege 'shares with those [privileges] typically labeled executive a justification rooted in the need to minimize disclosure of documents whose revelation might impair the necessary functioning of a department of the executive branch.'" <u>In re The City of New York</u>, 607 F.3d 923, 942 n.18 (2d Cir. 2010). In applying the law enforcement privilege to certain documents,

> the party asserting the law enforcement privilege bears the burden of showing that the privilege applies to the documents in question. <u>In re Sealed Case</u>, 856 F.2d 268, 271-72 (D.C. Cir. 1988). To meet this burden, the party asserting the law enforcement privilege must show that the documents contain information that the law enforcement privilege is intended to protect. Such protected information includes information pertaining to law enforcement techniques and procedures, information that would undermine the confidentiality of sources, information that would endanger witness and law enforcement personnel [or] the privacy of individuals involved in an investigation, and information that would otherwise . . . interfere[] with an investigation. <u>In re Dep't of Investigation of the City of New York</u>, 856 F.2d 481, 484 (2d Cir. 1988).

---

[3]Citations to "Pls.' Ltr." refer to the Letter in Opposition to Certain Terms in Defendants' Proposed Protective Order, filed by plaintiffs on November 24, 2015.

4

Id. at 944-45.

Thus, the party invoking the privilege must establish that the privilege applies to the documents in questions by making a "'substantial threshold showing' that harm is likely to occur as a result of disclosure of the requested documents." King v. Conde, 121 F.R.D. 180, 190 (E.D.N.Y. 1988). Such "substantial showings" include "competent declarations, [which] show[] the court what interests of law enforcement or privacy would be harmed, how disclosure under a protective order would cause the harm, and how much harm there would be . . . ." Cooks v. Town of Southampton, No. 13 CV 3460, 2015 WL 1476672, at \*6 (E.D.N.Y. Mar. 31, 2015) (quoting King v. Conde, 121 F.R.D. at 189). In making this threshold showing, the party invoking the privilege cannot simply "paint[] a picture of possible harms with a broad brush, without offering concrete details" of how disclosure would lead to harm. Adams v. City of New York, 993 F. Supp. 2d 306, 313-14 (E.D.N.Y. 2014); accord Miller v. Mehltretter, 478 F. Supp. 2d 415, 425 (W.D.N.Y. 2007) (finding that the law enforcement privilege did not apply because the party seeking the privilege could only provide "vague and conclusory statements without any specific or particularized facts" and failed to assert how the disclosure of the information would undermine enforcement techniques) (internal quotation marks and citations omitted).

Once the party invoking the privilege has made this threshold showing, there is a "strong presumption" against lifting it. Pegoraro v. Marrero, No. 10 CV 51, 2012 WL 1948887, at \*5 (S.D.N.Y. May 29, 2012). In order to rebut this strong presumption, the opposing party must show: (1) its suit is not frivolous, and brought in good faith; (2) the information is not readily available from other sources; and (3) the requested information is "important" to the party's case.

5

In re City of New York, 607 F.3d at 948. Information is "important" within the meaning of this test when the opposing party can demonstrate a "compelling need" for the documents. Id.

In conducting the "compelling need" analysis required to establish the importance of the requested information, the Court balances the need of the party seeking it against the public interest in nondisclosure. See Pegoraro v. Marrero, 2012 WL 1948887, at *5 (citing In re The City of New York, 607 F.3d at 948). In weighing these countervailing interests, the Court analyzes two separate, but related, considerations: "the sensitivity of the information in question" and whether the "lawsuit involves a public concern." Floyd v. City of New York, 739 F. Supp. 2d 376, 381 (S.D.N.Y. 2010). The more sensitive the information, the more likely it is to be protected from disclosure; the greater the issue of public concern, the less likely it will be protected. Id.

B. Analysis

In the case at hand, defendants are invoking the law enforcement privilege to limit disclosure of video footage documenting the Incident. Thus, defendants have the burden of showing that the privilege applies to the footage. Defendants' sole argument as to why the law enforcement privilege should apply is that "allowing plaintiffs to view and discuss the footage with their attorneys outside of this [internal investigation] process would likely interfere with recollections, statements, and the gathering of evidence for the investigation. Creating or altering statements in the record is precisely the type of interference with an investigation that privilege is intended to prevent." (Defs.' Mem.[4] at 4).

---

[4] Citations to "Defs.' Mem." refer to Defendants' Memorandum of Law in Support of Their Motion for a Protective Order, filed on December 9, 2015.

Even assuming that the defendants' vague and conclusory statements are correct, they in no way explain, with the specificity required, how the disclosure of the video footage would undermine the City's enforcement techniques and procedures, compromise the confidentiality of its sources, or impede the investigation, which has been ongoing for more than a year now. While the defendants state that allowing the plaintiffs to view the video footage would "likely" interfere with recollections, statements, and the gathering of evidence, this statement, without more detail, simply "paint[s] a picture of possible harms with a broad brush." Adams v. City of New York, 993 F. Supp. 2d at 313-14; see also Miller v. Mehltretter, 478 F. Supp. 2d at 425. As this is the only explanation given for the invocation of the law enforcement privilege, the Court finds that defendants have not shown, in a reasonably specific manner, how or why the plaintiffs viewing the video footage, prior to the termination of the internal investigation, would interfere with the process of gathering information for the internal investigation. At this point in time, if the plaintiffs have not been interviewed by investigators, there is a good chance that their recollections may already have been compromised by the passage of time, conversations with others, and any publicity the Incident may have attracted. The video footage may in fact be helpful in jogging memories and refreshing recollections. More importantly, if it is so critical that plaintiffs' statements be gathered before they could be tainted by other influences, it is unclear why the plaintiffs have not been interviewed by now.

Even if the defendants could satisfy their burden in invoking the privilege with respect to the video footage, the plaintiffs have shown a compelling need for the disclosure of the video footage sufficient to overcome the privilege. Defendants have not argued that plaintiffs' claims are frivolous or not brought in good faith. Thus, plaintiffs need only show that the information they seek cannot be procured through other discovery or sources.

7

Defendants argue that the information that the plaintiffs seek from the video footage — the identities of the correctional officers and their services addresses — is readily available in the use of force, incident, and medical reports already provided by defendants. (Defs.' Mem. at 4). Defendants claim that providing the plaintiffs with the use of force reports is sufficient for their discovery needs because they adequately "identify and distinguish each officer who used force and each officer who observed force." (Id. at 4). Plaintiffs assert that relying on the use of force reports would require them to "accept at face value the reports and accounts of defendants as to what transpired during the event and to trust that defendants obtained the names and identities of all the parties involved." (Pls.' Mem.[5] at 5).

The Court finds the plaintiffs' arguments persuasive. While use of force reports do provide valuable information regarding the Incident, including the identities of the corrections officers and their service addresses, they supplement, rather than replace, the video footage. As plaintiffs correctly point out, having to take the reports at face value would force plaintiffs to adopt the defendants' reports as true, despite the possibility that the reports fail to account for everyone involved in the Incident or fail to properly describe the role played by any specific defendant. The video footage more accurately captures the Incident, including any information which may be missing from defendants' reports. For that reason, the information sought by the plaintiffs in the video footage cannot be obtained from other sources.

The Court also finds that plaintiffs have demonstrated a "compelling need" for the video footage, having weighed the public interest in nondisclosure against the plaintiffs' need for access to the information. See In re The City of New York, 607 F.3d at 948. As explained above, in its

---

[5]Citations to "Pls.' Mem." refer to Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion for a Protective Order, filed on December 30, 2015.

8

analysis, the Court looks to the sensitivity of the information and whether the case involves an issue of public concern. See Floyd v. City of New York, 739 F. Supp. at 381. In Floyd, the Court addressed the issue of whether the NYPD's Internal Affairs Bureau ("IAB") report, which allegedly related to quotas on "stop and frisk" measures implemented by the NYPD, contained sensitive information. The Court, in holding that the IAB reports did not contain sensitive information, distinguished In re The City of New York, stating that the NYPD's IAB reports "did not involve secret operations or undercover officers. Nor d[id] the IAB investigations implicate such vital concerns as terrorism, mass unrest or riots, spiraling violence or chaos, or anything of the like. Disclosure of the IAB files will not cause an emergency or endanger any of the officers mentioned therein." Floyd v. City of New York, 739 F. Supp. 2d at 384; cf. Goodloe v. City of New York, No. 12 CV 3018, 2015 WL 5719663, at *14 (E.D.N.Y. Sept. 28, 2015) (holding that a report which contained information related to a confidential informant's confidentiality and safety was highly sensitive and whose disclosure would have a chilling effect upon the willingness of other individuals to help in future investigations and prosecutions as confidential informants).

Here, the video footage showing the alleged Incident does not involve secret operations or undercover officers, and thus does not implicate any confidentiality or privacy concerns. The video footage also contains no reference to "operations" or other procedures employed by the Department of Corrections; rather, it merely shows what occurred during the Incident. The contents of the video footage also do not address concerns of terrorism, mass unrest or riots. That being said, the video footage is likely to show acts of violence and chaos, which involve some degree of sensitive information. Cf. Floyd v. City of New York, 739 F. Supp. 2d at 384 (discussing the potential for exposing "spiraling violence or chaos" in the context of terrorism and mass unrest, indicating that in that case, information was considered sensitive because it was tied to

9

situations of mass violence affecting many people). While a number of inmates were allegedly injured during the events at OBCC on February 16, 2015, the information contained in the video footage is unlikely to rise to the level of mass harm to the community. Thus, the Court finds that the plaintiffs' need for the video footage outweighs the sensitivity of the information likely to be contained therein.

The Court must also assess whether the case at hand involves an issue of broad public concern. Such public concern includes the infringement of civil rights under 42 U.S.C. § 1983. See id. at 385. Ultimately, in light of privacy interests and sensitive information, where cases involve civil rights, "great weight [is] afforded to federal law against police departments." Id. (quoting Soto v. City of Concord, 162 F.R.D. 603, 616 (N.D. Cal. July 17, 1995)); accord Kitevski v. City of New York, No. 04 CIV 7402, 2006 WL 680527, at *3 (S.D.N.Y. Mar. 16, 2006). Further, the public has a profound interest "in reasonable transparency from law-enforcement agencies." Floyd v. City of New York, 739 F. Supp. 2d at 382. Given that the events which took place at OBCC include civil rights violations, and in light of the great weight afforded to transparency in the actions of law enforcement and corrections agencies, the plaintiffs have established that this case involves a matter of public concern.

Moreover, it seems clear that eventually, the defendants will want to use the video footage in this case. Their only argument seems to be one of timing; they object to its production while the investigation is ongoing. While the Court appreciates defendants' interest in ensuring that any witnesses to the Incident give their accurate and unaltered recollections of the event to assist in the

10

City's investigation,[6] defendants have had ample time to investigate and interview the plaintiffs in this matter. Fourteen months have passed since the Incident.

Accordingly, the Court denies defendants' motion for a protective order limiting disclosure of the video footage to "attorneys eyes only," and Orders defendants to produce the video footage of the Incident by May 31, 2016.[7]

II. Representation of Officers

Counsel for defendants also assert that, under the New York General Municipal Law, the Corporation Counsel is precluded from representing City employees in a lawsuit if the OBCC internal investigation determines that the defendants were "in violation of any rule or regulation of his agency at the time the alleged act or omission occurred." (Defs.' Mem. at 5-6); see also Gen. Mun. Law § 50-k. Counsel for defendants state that because they are prevented from speaking with the officers until the termination of the OBCC internal investigation, and because the internal investigation prevents the defendants from showing the video footage of the Incident to the defendants, the plaintiffs should be subject to the same limitation in viewing the footage. (Defs.' Mem. at 5-6). While counsel for defendants cites case law stating that the General Municipal Law governs Corporation Counsel's ability to represent individual officers, counsel has failed to provide any support for the contention that this limitation should be read to limit the discovery rights of plaintiffs.

---

[6]There is nothing in the record before this Court to indicate whether plaintiffs have been previously interviewed about the Incident. If the plaintiffs have already been interviewed, defendants' argument carries even less persuasive force.

[7]By Ordering production of the video footage on or before May 31, 2016, the Court is affording an additional 45 days during which the OBCC investigations may complete any interviews that might be "tainted" by review of the footage.

11

Without any explanation as to why the investigation has taken so long, or even as estimated projection as to when the investigation is expected to conclude, the Court is unwilling to further delay the progress in this case, particularly while the statute of limitations continues to run.

## CONCLUSION

In light of the foregoing, the Court denies defendants' request for a protective order. Defendants are Ordered to provide plaintiffs' counsel with a copy of the video footage documenting the Incident.

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
April 18, 2016

/s/ Cheryl Pollak

Cheryl L. Pollak
United States Magistrate Judge
Eastern District of New York

12